E-filed 10/28/2016

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVEREST NATIONAL INSURANCE COMPANY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SANTA CRUZ COUNTY BANK,<br><br>　　　　Defendant. | Case No.15-cv-02085-BLF   (HRL)<br><br>**ORDER ON DISCOVERY DISPUTE JOINT REPORTS 1 & 2**<br><br>Dkt. Nos. 38, 39 |

Plaintiff Everest National Insurance Company ("Everest") seeks a declaratory judgment stating that its policies do not cover defendant Santa Cruz County Bank's ("Santa Cruz") defense costs or losses in four underlying lawsuits. The suits concern a ponzi scheme in which one of Santa Cruz's Vice Presidents allegedly participated. Dkt. No. 21, ¶¶ 7-9. Santa Cruz counterclaims against Everest for its alleged bad faith in initially mishandling the first of the underlying actions ("*Bridges*") by wrongfully and unreasonably denying coverage before reversing course and advancing Santa Cruz's defense costs with a reservation of rights.

The parties have filed two Discovery Dispute Joint Reports. The court addresses each in turn.

**DISCOVERY DISPUTE JOINT REPORT #1**

In the first Discovery Dispute Joint Report, the parties dispute whether loss reserves information for each underlying claim is discoverable.

In California, insurers are required by statute to keep loss reserves. *Lipton v. Superior Court of Los Angeles Cnty.*, 48 Cal. App. 4th 1599, 1612 (1996). Reserves are "the amount estimated in the aggregate to provide for the payment of all losses and claims for which the insurer may be liable, and to provide for the expense of adjustment or settlement of losses and claims."

*Id.* at 1613 (quoting Cal. Ins. Code § 923.5). Loss reserves thus reflect the insured's estimates of its potential liability, but they are not admissions of such liability. *Id.*

The conflict between the parties concerns whether loss reserve information is relevant to Santa Cruz's bad faith claims. Santa Cruz argues that Everest's initial decision to deny advancement of defense costs in the *Bridges* case on the grounds that they were not covered by the policy was made in bad faith. It asserts that whether Everest kept loss reserves for this matter would suggest that Everest saw a potential for liability—or that it saw none, if it kept no reserves. Everest argues that the reserve information is not relevant because Everest did not have a duty to defend under the *Bridges* policy, and reserves are only relevant where such a duty is present.

Parties may obtain discovery of non-privileged information that is "relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b). "Information . . . need not be admissible in evidence to be discoverable." *Id.*

Courts have found reserve information relevant and discoverable in the past in similar circumstances. For example, in *Lipton v. Superior Court of Los Angeles County*, the court held that reserve information was discoverable in a bad faith case. 48 Cal. App. 4th 1599, 1614. The court, concluding that reserve information could lead to discovery of admissible evidence "on any number of issues," cited as an example: "in a case where the insurer has denied coverage and refused a defense, the *fact* that a reserve had been set by the insurer might well be relevant to show that the insurer must have had some knowledge that a *potential* for coverage existed." *Id.*; *see also Miller v. Elite Ins. Co.*, 100 Cal. App. 3d 739, 753 (1980) (noting that "establishment of a reserve fund for the defense" of a claim is an indication that the insurer perceived a potential for liability); *Bernstein v. Travelers Ins. Co.*, 447 F. Supp. 2d 1100 (N.D. Cal. 2006).

The court is persuaded that loss reserve information is relevant to the current dispute. Whether Everest kept loss reserves for the *Bridges* claim is probative of whether it thought it had any potential liability. Everest's assessment of its potential liability is probative of whether it thought its policy covered the *Bridges* matter. And Everest's conclusions regarding its policy's coverage is probative of whether it acted in good faith by initially denying the advancement of any defense costs on the grounds that there was no coverage.

2

Everest argues that reserve information is irrelevant absent a duty to defend, which is not included in its policy with Santa Cruz, and that the cases Santa Cruz cites are limited to the duty-to-defend context. But nothing in the language or logic of these cases or those cited by Everest convinces the court that the relevance of loss reserves information is so limited.[1] Even if, as Everest asserts, a duty to advance defense costs is analyzed under a different legal standard from a duty to defend, whether an insurer kept loss reserves remains relevant to the insurer's assessment of its potential liability and its conclusions about the policy's coverage—regardless of whether the policy contained a duty to defend or a duty to advance costs. Given the policy's requirement that Everest "shall advance covered Defense Costs" or, if the parties arbitrate a dispute over allocation of defense costs, that Everest "shall advance . . . Defense Costs which [it] believes to be covered . . . .," Dkt. No. 38, at 8, to the extent that Everest's loss reserve estimates may reflect its beliefs about coverage, the court is persuaded that such information remains relevant and discoverable.

The court thus orders Everest to produce all responsive documents containing loss reserve information and to produce unredacted versions of documents from which it has redacted reserve information in keeping with this order.

## DISCOVERY DISPUTE JOINT REPORT #2

In their second joint report, the parties dispute whether Everest must supplement its responses to Santa Cruz's interrogatories four through eight.

Everest's initial decision to decline to advance defense costs for the *Bridges* action was

---

[1] For example, in *American Protection Insurance Co. v. Helm Concentrates, Inc.*, the court stated: "In considering whether an insurer acted in bad faith in denying its duty to defend under a 'third party' liability policy the fact that it established a reserve, particularly for litigation costs, is probative on the issue of whether there is a 'potential for liability.' Thus when an insurer, by its actions, acknowledges a potential for liability and fails to attempt to settle a claim against its insured and/or fails to defend, reserve information is relevant to the issue of good faith." 140 F.R.D. 448, 449-50 (E.D. Cal. 1991). Though the court ultimately denied discovery of loss reserve information, the court made it clear that the reserve information was not relevant because the policy at issue concerned first-party insurance, not third-party liability insurance. *Id.* ("the court agrees with APICO's distinction between first party and third party (liability) policies with respect to the relevancy of reserve information."). The court did not suggest that the probativeness of reserve information on the issue of the scope of policy coverage depended on the existence of a duty to defend.

based in part upon its interpretation of the "Securities Underwriting Exclusion" in Santa Cruz's policy. Dkt. No. 39, at 1. As stated above, Everest is now seeking a declaration that its policy does not cover the *Bridges* action (and the other underlying suits), and Santa Cruz accuses Everest of denying coverage for *Bridges* in bad faith.

Santa Cruz sought discovery regarding Everest's interpretations of the relevant exclusion.[2] Dkt. No. 39, Ex. 1. In interrogatories four through seven, Santa Cruz asked for Everest's interpretations of specific phrases from that section of the policy.[3] For example, interrogatory four reads: "What do YOU contend is the meaning of the term 'promoting any security' in the SECURITIES UNDERWRITING EXCLUSION as that term is used in the SECURITIES UNDERWRITING EXCLUSION?" Interrogatories five through seven are identical to number four except for the terms about which Santa Cruz inquired, and interrogatory eight seeks similar information with respect to a phrase in a different section of the policy. *Id.*

Everest responded to each of these interrogatories with nearly identical three-part answers. First, Everest objected that the interrogatories seek irrelevant information "given the legal requirement that all policy language be considered in the context of the policy as a whole and with reference to a specific claim[.]" Second, Everest objected that the interrogatories seek pure legal conclusions. And third, Everest, without waiving its objections, "contend[ed] that the terms in question are to be understood in their ordinary and popular sense of said terms as read within the relevant policy in its entirety and with reference to a given specific claim that could potentially fall within coverage under a policy." *Id.*

---

[2] The "Investment Banking/Securities Underwriting Exclusion" reads: "The Insurer shall not be liable to make any payment for Loss in connection with any Claim arising out of or in any way involving: (1) underwriting, syndicating or promoting any security (except loan syndications or equity or debt securities issued by the Company); (2) rendering of advice or recommendations regarding any actual or attempted or threatened merger, acquisition, divestiture, tender offer, proxy content, leveraged buy-out, going private transaction, bankruptcy, reorganization, restructuring, recapitalization, spin-off, offering of securities, dissolution or sale of all or substantially all of the assets or stock of an entity; (3) rendering of any fairness opinion; (4) proprietary trading; (5) any acquisition or sale of securities of the Company for its own account; or (6) any other investment banking activity, including any disclosure requirements in connection with any of the foregoing."
[3] Santa Cruz asked for Everest's interpretations of the following phrases: "promoting any security," "Securities Underwriting," "offering of securities," "investment banking activity," and, in Section IX(A)(2) of the policy, "relative legal exposures."

4

1  In the joint report, Santa Cruz asserts that Everest should be required to supplement its responses to interrogatories four through eight.  Santa Cruz argues that, in order to defend against Everest's claim that the exclusion does not provide coverage, it needs to know Everest's interpretation of the exclusion and the section referenced in interrogatory eight. Everest's current responses are inadequate, Santa Cruz asserts, because the key terms it has identified do not have "ordinary and popular" meanings.  Additionally, Santa Cruz rejects Everest's objections, arguing that a parties' interpretation of a term is not necessarily a purely legal question, and that the federal rules permit interrogatories seeking opponents' legal theories provided that the question "serve[s] a 'substantial purpose' in prosecution of the suit, such as a narrowing of issues." Dkt. No. 39, quoting *Hockley v. Zent, Inc.*, 89 F.R.D. 26, 31 (M.D. Pa. 1980).  In response, Everest argues that it should not have to supplement its responses, because (1) it has no special definitions of the terms beyond their plain meaning and would have to invent such definitions in order to respond as Santa Cruz requests; and (2) Santa Cruz seeks a purely legal answer on a question of law.

Federal Rule of Civil Procedure 33 draws a distinction between questions of fact or of the application of law to fact on one hand and pure questions of law on the other.  *See* Fed. R. Civ. P. 33 (an interrogatory is "not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact,"); *AngioScore, Inc. v. TriReme Medical, Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("interrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case' are not permitted") (quoting Schwartzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial ¶ 11:1680 (The Rutter Group 2014)).  Courts have policed this implied distinction, permitting interrogatories involving law and fact, but declining to require responses to those asking solely about questions of law.  *Kendrick v. Sullivan*, 125 F.R.D. 1, 3 (D. D.C. 1989) ("Instead of 'the application of law to fact,' these responses would involve issues of 'pure law,' and for that reason are impermissible under Rule 33[(a)(2)].").

Generally, the interpretation of a provision in an insurance policy is a question of law. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 ("Interpretation of an insurance policy is a question of law.").  The court, in construing policy language, looks at the policy as a whole and

5

attempts to give effect to the intent of the parties. *Bank of the West v. Superior Court of Contra Costa Cnty.*, 2 Cal. 4th 1254, 1264-65 (1992).

Here, the court agrees with Everest that Santa Cruz's interrogatories four through eight are questions of pure law. The interrogatories ask Everest what it contends certain phrases in its policy mean (e.g., "What do YOU contend is the meaning of the term 'promoting any security' in the SECURITIES UNDERWRITING EXCLUSION as that term is used in the SECURITIES UNDERWRITING EXCLUSION?"). They do not ask Everest how it applied these terms in the past, or what Everest contends the terms mean with respect to the particular claims at issue (questions that would call for the application of law to fact). Rather, the interrogatories invite answers involving abstract legal definitions or discussions entirely divorced from the factual context of this case.

While Santa Cruz correctly points out that a request for a parties' interpretation of a term is not necessarily a purely legal question, and that interrogatories narrowing or sharpening the issues of a case are permitted under the Federal Rules of Civil Procedure, the court is not persuaded that these points apply to the interrogatories here. The plaintiff cites *Hockley v. Zent, Inc.*, 89 F.R.D. 26, 31 (M.D. Pa. 1980), to support its argument, and that case, which is not instructive on its facts, cites *Scovill Manufacturing Co. v. Sunbeam Corp.*, 357 F. Supp. 943, 948-49 (D. Del. 1973). In *Scovill*, the court permitted interrogatories requesting legal theories where the answers "might be expected to help the plaintiff to know what proofs were required." *Id.* But the interrogatories at issue in *Scovill* asked about legal theories that would necessarily involve both fact and law. *Id.* (describing, in a patent case, contention interrogatories requiring answers that would touch upon both the technical and physical aspects of the contested patents).

The interrogatories here, however, represent an unusual example of a party asking for legal argument without a direct connection to the facts of this case. As the court does not read the questions posed by Santa Cruz as anything but inquiries into purely legal matters, it thus finds *Scovill*, and similar cases, distinguishable. *See also In Re Rail Freight Fuel Surcharge Antitrust Litig.*, 281 F.R.D. 1, 3-4 (D. D.C. 2011) (requiring response to contention interrogatory asking for party to identify communications that it contends constitute unlawful agreements; i.e., requiring a

6

1 legal answer linked to the facts of the case); *Schaap v. Exec. Indus., Inc.*, 130 F.R.D. 384, TK
2 (N.D. Ill. 1990) (requiring responses to questions asking for legal contentions regarding specific
3 facts and noting, "a party does not have to answer a question that delves into purely legal issues
4 unrelated to the facts of the case.").
5 Since Santa Cruz's interrogatories request a purely legal response and do not request
6 answers linked specifically to the facts of this case, the court will not require Everest to
7 supplement its responses.

## CONCLUSION

With respect to Discovery Dispute Joint Report #1, Everest shall produce all responsive documents containing loss reserve information and unredacted versions of documents from which it has redacted reserve information in keeping with the terms of this order by November 14, 2016 (fact discovery closes December 2, 2016). With respect to Discovery Dispute Joint Report #2, Everest is not required to supplement its responses to Interrogatories four through eight.

**IT IS SO ORDERED.**

Dated: 10/28/16

HOWARD R. LLOYD
United States Magistrate Judge

7